*Amalgamated Transit Union, Local 1300 v. Maryland Transit Administration*, No. 1591, September Term 2017

Opinion by Kehoe, J.

**ALTERNATIVE DISPUTE RESOLUTION – ARBITRATION – REVIEW, CONCLUSIVENESS AND ENFORCEMENT OF AWARD**

The scope of judicial review of arbitral awards is very narrow. Courts generally defer to an arbitrator's findings of fact and her application of the law, even when these are erroneous. The rationale for this general rule of deference is both practical (if arbitral awards were constantly subjected to judicial second-guessing, arbitration would cease to be a simple and inexpensive way to resolve disputes) and conceptual (the parties have bargained for an arbitrator's—and not a court's—resolution of the dispute submitted to arbitration). So long as the arbitrator acts within the bounds of her authority, her award conclusively establishes as a matter of contract interpretation the meaning and proper application of the contractual provisions at issue.

**ALTERNATIVE DISPUTE RESOLUTION – ARBITRATION – COMMON-LAW GROUNDS FOR VACATUR OF ARBITRAL AWARD**

In rare instances, courts may decline to defer to the arbitrator and vacate the award. The common-law bases for vacating an arbitral award fall into three categories. First, courts may vacate an award because it is not the result of a legitimate construction of the contract—i.e., the award is the product of the arbitrator's bias, prejudice, fraud or other misconduct, or the arbitrator exceeded the scope of the issues submitted to arbitration. Second, courts may vacate an award because, on the merits, the award demonstrates a manifest disregard of the law or contains a palpable mistake of fact apparent on the face of the award. Third, courts may vacate an award because enforcing it would be contrary to an explicit, well-defined and dominant public policy.

**ALTERNATIVE DISPUTE RESOLUTION – ARBITRATION – GROUNDS FOR VACATUR OF ARBITRAL AWARD – VIOLATION OF PUBLIC POLICY**

Public-policy challenges put a narrow question before a reviewing court: Accepting the facts as found by the arbitrator as well as the arbitrator's interpretation of the agreement at issue, can the agreement, as interpreted, be enforced?

**ALTERNATIVE DISPUTE RESOLUTION – ARBITRATION – GROUNDS FOR VACATUR OF ARBITRAL AWARD – PUBLIC POLICY – PROGRESSIVE DISCIPLINARY POLICIES – WORKPLACE VIOLENCE**

Insofar as the collective-bargaining agreement at issue has been interpreted to exclude from its definition of "just cause" for termination clearly established serious acts of workplace violence, unless the MTA factors into its termination decision mitigating circumstances from the employee's work history and considers a range of less serious sanctions, the award cannot be enforced in our courts. Maryland public policy, explicitly set forth in Md. Code State Pers. & Pens. § 11-105, provides that serious acts of workplace violence give a state agency cause for automatic termination of employment.

Circuit Court for Baltimore City
Case No. 24-C-17-000103

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1591

September Term, 2017

_____

AMALGAMATED TRANSIT UNION,
LOCAL 1300

v.

MARYLAND TRANSIT ADMINISTRATION

_____

Meredith,
Kehoe,
Friedman,

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: December 23, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Maryland Transit Administration ("MTA") fired Christopher Wilson because of an incident of workplace violence. Wilson challenged this decision. Pursuant to the terms of the collective-bargaining agreement between the MTA and the union representing Wilson, Local 1300 of the Amalgamated Transit Union ("Local 1300"), the matter was submitted to arbitration. The arbitrator ruled in Wilson's favor, deciding that the MTA did not have just cause to terminate Wilson, and ordered his reinstatement. The MTA filed a petition to vacate the arbitrator's award, and Local 1300 countered with a petition to enforce it. The Circuit Court for Baltimore City vacated the arbitration award and upheld Wilson's termination, concluding that the arbitrator's decision should not be enforced because it was "clearly against public policy." Local 1300 has appealed from the court's judgment and presents two issues, which we have reworded and reordered:

> 1. Did the trial court err by vacating the arbitration award on public-policy grounds?
> 2. In reaching its decision, did the trial court err in failing to consider Local 1300's timely filed response and cross-motion for summary judgment?

For the reasons explained below, we will affirm the circuit court's judgment.

## Background

### The incident

This appeal arises out of a fight between Wilson, then an MTA bus driver, and Kenneth Rosebrough, a retired bus driver and Wilson's estranged stepfather. This fight was captured on MTA security cameras and was described in detail in the arbitrator's award. We will summarize the key events.

At the end of his run on September 14, 2015, Wilson returned to the Northwest Bus Division, an administrative facility where MTA buses are parked. When Wilson went inside, he found Rosebrough waiting for him in the building's assembly room. Rosebrough got up and the two men conversed as they walked outside to the MTA's parking lot. By the time they were outside, their discussion had grown heated and things got physical. Rosebrough took a step toward Wilson, and Wilson pushed Rosebrough. The two started throwing punches. The men grabbed each other and wrestled themselves onto a nearby car, where two MTA employees broke up the fight. At some point during the brawl, Wilson stabbed Rosebrough in the stomach with a penknife. Rosebrough left the MTA property in his own car but was stopped by a police officer shortly thereafter. When the officer learned about Rosebrough's stab wound, he arranged for Rosebrough to be taken by ambulance to a hospital for treatment.

At first, Wilson told investigators that Rosebrough brought the knife to the fight. Later, Wilson admitted that it was he who brought the knife—that he had accidentally left it in his pocket after breaking down boxes at home during his break.

Wilson was charged with second-degree assault. On February 24, 2016, he tendered an *Alford* plea and was given probation before judgment. Wilson also faced consequences at work: on April 6, 2016, after a hearing, he was fired.

The arbitration proceeding and the arbitral award

The collective-bargaining agreement between the MTA and Local 1300 required that termination of employment be for "just cause." The agreement also provided that a

terminated employee could request review of the MTA's decision by an arbitrator, and that the arbitrator's decision would be final and binding upon the parties. Wilson invoked his right to an arbitral review, and the arbitration proceeding was held on August 22, 2016.

As a part of the proceeding, all parties were given a full opportunity to be heard, to present evidence and to examine and cross-examine witnesses. To justify the termination, the MTA pointed to Wilson's violations of MTA regulations and the MTA's workplace-violence policy. The MTA regulations subjected employees to "immediate dismissal" for, *inter alia*, possessing dangerous or deadly weapons on MTA property, for fighting on MTA property or for violating the workplace-violence policy. The workplace-violence policy prohibited "commit[ting] any violent act against any person" and "[b]ring[ing] weapons of any kind into the workplace"; encouraged employees to seek law-enforcement assistance when confronted with "violent situations" and to avoid confrontation with "verbally abusive or harassing persons"; and subjected employees engaging in prohibited conduct to sanctions, ranging from reprimand and loss of leave to suspension, demotion and termination.

The arbitrator was unconvinced. In his written decision, the arbitrator found that Wilson's conduct on September 14, 2015, violated the clear language of the MTA's regulations and workplace-violence policy. He also refused to accept Wilson's defenses for the stabbing—that he acted in self-defense or that the MTA's lax security was to blame, because this allowed Rosebrough on the MTA's property in the first place. The arbitrator nonetheless concluded Wilson's termination "was not for just cause." He explained that,

in reaching its decision to fire Wilson, the MTA had failed to consider mitigating circumstances surrounding his "respectable work and disciplinary records." The arbitrator also explained that by failing to "review[] all the facts and circumstances" to determine which among "a range of disciplinary penalties" would be the most proportionate sanction for Wilson's misconduct, the MTA's termination decision deviated from the model of progressive discipline called for by the administration's own policy.[1]  Because he believed the MTA had improperly short-circuited this system of escalating responses to employee misconduct, the arbitrator ordered Wilson's reinstatement, although without back pay.

Proceedings before the circuit court

The MTA filed a petition, later amended, to vacate the arbitration award in the Circuit Court for Baltimore City. The MTA's position was that enforcement of the arbitrator's award would violate Maryland's clear public policy against workplace violence and thus had to be vacated. In response, Local 1300 petitioned to enforce the award.

The parties entered a joint stipulation in which they agreed upon filing deadlines for certain motions and responses. This included an August 30, 2017, deadline for Local 1300's response to the MTA's motion for summary judgment and its own cross-motion for

---

[1] Specifically, the arbitrator cited Section 9.1.1 of the MTA's workplace-violence policy, which states in pertinent part:

> An employee engaging in conduct prohibited by this policy shall be disciplined. Appropriate sanctions will be determined by the appointing authority after consultation with employee relations and/or legal professionals and may include: reprimand, loss of leave, suspension, demotion, or termination.

summary judgment. The circuit court approved the joint stipulation and the parties filed motions for summary judgment and responses according to it. Specifically, the MTA filed its motion for summary judgment on August 2, 2017, and Local 1300 timely filed a response and its cross-motion for summary judgment on August 29, 2017.

On September 1, 2017, the circuit court granted the MTA's motion for summary judgment. The court ruled that no genuine issues of material fact existed, and that the arbitration award could not be enforced because it violated public policy:

> [T]he purpose of MTA's policy against workplace violence and possession of weapons is to ensure public safety . . . . Not only did Mr. Wilson violate the MTA workplace violence policy but he violated Maryland statutory criminal law. Mr. Wilson pled guilty to criminal conduct. . . . [T]he Arbitrator's award reinstating Christopher Wilson as a bus operator is contrary to MTA's duty to ensure public safety as a common carrier. This Court declines to enforce an arbitration award which is contrary to a clear public policy.

(references to docket entries omitted). Accordingly, the court vacated the arbitrator's award.

The written opinion accompanying the September 1, 2017, order explicitly noted that Local 1300 had not filed a timely response to the MTA's motion for summary judgment. This was incorrect; Local 1300 had in fact filed a response on August 29. When this was brought to the court's attention, it reopened the case and scheduled a hearing for September 27, 2017.

At that hearing, the court first explained its reasoning for granting the MTA's motion for summary judgment. The court then noted that it incorrectly believed that Local 1300 had not filed a response, and it informed counsel for the Local that "we're here today as if

- 5 -

this was a fresh and a new motion." Still, after hearing argument from counsel, the court again granted the MTA's motion. In doing so, the court explained that it considered Local 1300's response to the MTA's motion for summary judgment to have been untimely filed; that after considering Local 1300's cross-motion for summary judgment "on its merits," the motion was nonetheless moot; and that the court's earlier order granting the MTA's motion for summary judgment "stands as the law of this case." The court vacated the arbitrator's decision reinstating Mr. Wilson on the grounds that it violated public policy.

Local 1300 then timely filed this appeal.

**Analysis**

To this Court, Local 1300 raises a substantive and a procedural challenge to the circuit court's decision to grant summary judgment to the MTA and vacate the arbitral award reinstating Wilson.

We will first address Local 1300's substantive challenge: that the circuit court improperly applied the requirements for vacating an arbitral award on public-policy grounds. In explaining why we disagree with Local 1300, we provide an overview of the general rule of judicial deference to the decisions of arbitrators and explain some of the common-law exceptions to that rule. We then apply the exception at issue here—the public-policy challenge to the enforceability of an arbitral award—to the facts of the case. We conclude that enforcement of this particular award would violate Maryland public policy and therefore affirm the judgment of the circuit court.

Second, we will address the procedural challenge: that the circuit court erred in failing to consider Local 1300's response and cross-motion for summary judgment when ruling on the MTA's motion for summary judgment. There was a procedural misstep, but, as we explain, the error was harmless.

### 1. The standard of review

Appellate courts review *de novo* a circuit court's decision to grant a motion for summary judgment. *See, e.g.*, *Baltimore County v. Kelly,* 391 Md. 64, 73 (2006). We employ the same *de novo* standard when reviewing a circuit court's ruling on a petition to vacate an arbitrator's award. *Prince George's County Civilian Employees Ass'n v. Prince George's County*, 447 Md. 180, 192 (2016) ("An appellate court reviews without deference a trial court's ruling on a petition to vacate an arbitration award.").

As a general rule, when reviewing a circuit court's decision to grant summary judgment, we consider "only the grounds upon which the trial court relied." *Greenstein v. Council of Unit Owners of Avalon Court Six Condo*., 201 Md. App. 186, 197 (2011) (quoting *Property & Casualty Insurance Guaranty Corp. v. Yanni*, 397 Md. 474, 480–81 (2007)). However, if, as in the present case, a motion for summary judgment is based solely upon an issue of law, then "we may affirm on an alternative ground." *Warsham v. James Muscatello, Inc*., 189 Md. App. 620, 635–36 (2009) (quoting *Washington Mutual Bank v. Homan*, 186 Md. App. 372, 388 (2009)).

### 2. Vacatur of the arbitration award

Local 1300's first argument is that the circuit court erred in granting summary judgment in favor of the MTA, vacating the arbitration award on public-policy grounds. The circuit court, citing Maryland statutory criminal law, common-carrier duties to ensure passenger safety, MTA employee rules and regulations, and the MTA's workplace-violence policy, concluded that the arbitrator's decision to reinstate Wilson was "clearly against public policy" and thus could not be enforced.

Although our analysis differs from that of the circuit court, we ultimately reach the same conclusion. Enforcing the arbitral award in this case would violate Maryland public policy.

### A. The general rule of judicial deference to arbitral awards

The scope of judicial review of arbitral awards is "very narrowly limited." *Prince George's County Police Civilian Employees Ass'n v. Prince George's County*, 447 Md. 180, 192 (2016) (quoting *Downey v. Sharp*, 428 Md. 249, 268 (2012)). Indeed, the standard of review in this context is "among the narrowest known to the law." *Letke Security Contractors, Inc. v. United States Surety Co.*, 191 Md. App. 462, 472 (2010) (quoting *Litvak Packing Co. v. United Food & Commercial Workers, Local Union No. 7*, 886 F.2d 275, 276 (10th Cir. 1989)). We generally defer to an arbitrator's findings of fact and her application of the law, *Baltimore County v. Mayor and City Council of Baltimore*, 329 Md. 692, 701 (1993), even when these are erroneous, *Downey*, 428 Md. at 266.

The rationale for this general rule of deference is twofold. The first reason is practical, often cast in terms of a public policy of encouraging arbitration as an efficient means of

extrajudicial dispute resolution. *See, e.g.*, *American Union of Baptists, Inc. v. Trustees of the Particular Primitive Baptist Church at Black Rock, Inc.*, 335 Md. 564, 571 (1994) ("This Court has long held arbitration to be a favored method of dispute resolution; consequently, we have generally deferred to the arbitrator's findings of fact and applications of law." (cleaned up)). Maryland courts encourage arbitration because "it provides an informal, expeditious, and inexpensive alternative to conventional litigation." *Prince George's County Police Civilian Employees Ass'n*, 447 Md. at 192 (quoting *Amalgamated Transit Union v. Lovelace*, 441 Md. 560, 576 (2015) (cleaned up)). If arbitral awards were constantly subjected to judicial second-guessing, arbitration would cease to be a "simple and inexpensive" way to resolve disputes. *WSC/2005 LLC v. Trio Ventures Associates*, 460 Md. 244, 254 (2018) (cleaned up).

The second reason for deference to the arbitrator is more conceptual: we rarely disturb an arbitral award because the parties have bargained for an arbitrator's—and not a court's—resolution of the dispute submitted to arbitration. The arbitrator is the parties' "jointly designated decider," there to resolve issues generated by a contract's open-ended terms. Frank H. Easterbrook, *Arbitration, Contract and Public Policy*, *in Arbitration 1991: The Changing Face of Arbitration in Theory and Practice* 65, 69 (Gladys W. Gruenberg ed., 1992). This point was well made by Judge, later Justice, Thurgood Marshall in *Local 453, International Union of Electrical Workers v. Otis Elevator Co.*, 314 F.2d 25 (2d Cir. 1963) (emphasis added):

> Having bargained for the decision of the arbitrator on the question of whether [an employee's] conduct and criminal conviction constituted "just cause" for

discharge, the parties are bound by it, even if it be regarded as unwise or wrong on the merits; *so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his*. To separate the just causes for discharge from the injust was *precisely what the parties clothed the arbitrator with the authority to do*.

*Id.* at 28; *cf. Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 61 (2000) ("[W]e must assume that the collective-bargaining agreement itself calls for Smith's reinstatement. . . . because both employer and union have granted to the arbitrator the authority to interpret the meaning of their contract's language[.]"). Maryland appellate courts have repeatedly invoked Justice Marshall's analysis. *See Prince George's County Police Civilian Employees Ass'n*, 477 Md. at 193; *Amalgamated Transit Union, Division 1300 v. Mass Transit Administration*, 305 Md. 380, 388 (1986) ("*MTA-Smith*")[2]; *International Association of Firefighters, Local 1619 v. Prince George's County*, 74 Md. App. 438, 447 (1988). So long as the arbitrator acts within the bounds of her authority, her award "conclusively establish[es] as a matter of contract interpretation" the meaning and proper application of the contractual provisions at issue. *Id*. This allocation of responsibility leaves little for courts to evaluate when asked to enforce or vacate an arbitral award.

### B. Exceptions to the general rule of judicial deference

---

[2] To distinguish the decision by the Court of Appeals in *Amalgamated Transit Union, Div. 1300 v. Mass Transit Admin.*, 305 Md. 380 (1986), from the present case, we will refer to it as "*MTA-Smith*," as the employee in that case was named Smith.

Judicial deference to arbitrators' decisions is not without limit. Even though the parties have agreed that the arbitrator's construction of their agreement is definitive, "in rare instances" courts may decline to defer to the arbitrator and may instead vacate the award. *Eastern Associated Coal*, 531 U.S. at 62.

The Maryland Uniform Arbitration Act provides a list of statutory grounds for vacating arbitral awards. *See* Md. Code, Cts. & Jud. Proc. § 3-224(b). But in this case, we are concerned with only common-law grounds for vacatur. This is because Cts. & Jud. Proc. § 3-206(b) expressly states that the act "does not apply to an arbitration agreement between employers and employees or between their respective representatives unless it is expressly provided in the agreement that this subtitle does apply." Neither party claims that the act is made applicable by any provision in the collective-bargaining agreement.

The common-law bases for vacating an arbitral award fall into three categories. In the first class of challenges, parties may succeed in vacating an arbitral award by showing that the award is not the result of a legitimate construction of the contract. This can occur in one of two ways. First, the award may be the product of the arbitrator's bias, prejudice, corruption, bad faith, fraud or other misconduct. *Baltimore County Fraternal Order of Police Lodge No. 4 v. Baltimore County*, 429 Md. 533 (2012) (citing *Board of Education of Prince George's County v. Prince George's County Educators' Ass'n*, 309 Md. 85, 100 (1987)). Second, in reaching her decision, the arbitrator might exceed the scope of the issues actually submitted to arbitration. *Id.* In either scenario, the arbitrator has, in some way, strayed from her charge, and so the arbitral award cannot be enforced. *See United*

- 11 -

*Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) ("[A]n arbitrator . . . does not sit to dispense his own brand of industrial justice. . . . [H]is award is legitimate only so long as it draws its essence from the . . . agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.").

In the second category of common-law challenges, parties attack the merits of the arbitrator's award, rather than the way in which the arbitrator's decision was reached. In Maryland, a substantive attack will be successful only in cases in which the award "demonstrates a 'manifest disregard of the law . . . beyond and different from a mere error in the law or failure on the part of the arbitrator[] to understand or apply the law.'" *Baltimore County Fraternal Order of Police Lodge No. 4*, 429 Md. at 564 (quoting *Prince George's County Educators' Ass'n*, 309 Md. at 102); *see also WSC/2005 LLC*, 460 Md. at 254–56 (providing a comprehensive history of the "manifest disregard" standard as a common-law ground for vacating an arbitration award, dating back to a 1793 decision of the General Court of Maryland). Additionally, an arbitrator's award may be set aside for "a palpable mistake of . . . fact . . . apparent on the face of the award." *Downey*, 428 Md. at 264 (cleaned up). These errors of law or fact should be "so gross as to work manifest injustice," *id.*, "readily perceived," "obvious," "clear or unquestionable," *WSC/2005 LLC*, 460 Md. at 263. That a reviewing court simply would have interpreted the contract differently is not enough. *Prince George's County Police Civilian Employees Ass'n*, 447 Md. at 193 (2016) ("[A] court may not substitute its interpretation of a contract for an

- 12 -

arbitrator's.").[3] In these cases, the arbitral award results from construction of the contract—

but that construction must be *exceedingly* wide of the mark to warrant vacatur by a court.

There is a third way to vacate an arbitral award. Even when a party does not allege

impropriety on the arbitrator's part or error in his interpretation, he may still seek the

vacatur of the award on the grounds that enforcing the award would be "contrary to a clear

public policy." *Prince George's County Education Ass'n*, 309 Md. at 100 (citing *MTA-*

---

[3] At first glance, Maryland's approach appears to be different from the approach taken by the Supreme Court in interpreting the Federal Arbitration Act and applying federal common law. The Supreme Court has consistently held that even glaring errors in the interpretation of a contract do not stand to be corrected by courts on review. *See, e.g.*, *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 572–73 (2013) ("[C]onvincing a court of an arbitrator's error—even his *grave error*—is not enough. . . . The arbitrator's construction holds, however good, bad, or ugly." (emphasis added)); *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed *serious error* does not suffice to overturn his decision." (emphasis added)). To put it another way, the federal approach is to abstain from reviewing the merits of an arbitrator's decision *even if* it is really wrong. By contrast, Maryland's approach is to abstain from reviewing the merits of an arbitrator's decision *unless* it is really wrong.

These approaches are not as divergent as they first appear. Judge Frank H. Easterbrook has posited that a serious error in the interpretation of the contract may suggest the arbitrator wasn't really interpreting the contract to begin with—the first kind of challenge discussed above. *See* Frank H. Easterbrook, *Arbitration, Contract, and Public Policy*, *in Arbitration 1991: The Changing Face of Arbitration in Theory and Practice* 65, 69 (Gladys W. Gruenberg ed., 1992) ("If no rational bank would enter into a contract excusing embezzlement, then a court might properly conclude that an arbitrator who excuses this crime is indulging in a personal quirk, has succumbed to the desire to give someone a 'second chance' and *has abandoned his role as honest interpreter of the contract*." (emphasis added)); *cf. Typographical Union #16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505–06 (7th Cir. 1991) ("The zanier the award, the less plausible it becomes to ascribe it to a mere error in interpretation rather than *a willful disregard of the contract*." (emphasis added)).

*Smith*, 305 Md. at 389 n.5); *see also Prince George's County v. Police Civilian Employees Ass'n,* 219 Md. App. 108, 121 (2014), *aff'd in part, rev'd in part on other grounds*, 447 Md. 180 (2016).

A public-policy challenge, as the Supreme Court of Connecticut has explained, puts a narrow question to the court:

> [T]he court is not concerned with the correctness of the arbitrator's decision *but with the lawfulness of enforcing the award*. Accordingly, the public policy exception to arbitral authority should be narrowly construed and a court's refusal to enforce an arbitrator's interpretation of a collective bargaining agreement is limited to situations where the contract *as interpreted* would violate some explicit public policy.

*Town of Groton v. United Steelworkers of America*, 254 Conn. 35, 46, 757 A.2d 501, 508–09 (2000) (cleaned up and emphasis added). This is because, in the context of a public-policy challenge, the arbitrator's award is treated as if it represented an agreement between the parties as to the proper meaning of the contract's words; "the award is not distinguishable from the contractual agreement." *Eastern Associated Coal*, 531 U.S. at 62. And "[a]s with any contract, 'a court may not enforce a collective bargaining agreement that is contrary to public policy.'" *MTA-Smith*, 305 Md. at 389; *cf. W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983) ("If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it.").

The public policy relied upon to vacate the arbitral award must be "explicit," "well defined and dominant." *MTA-Smith*, 305 Md. at 389 (quoting *W.R. Grace & Co.*, 461 U.S.

at 766). And it should be derived from "laws and legal precedents," not from "general considerations of supposed public interests." *MTA-Smith*, 305 Md. at 389 (cleaned up).

Importantly, a public-policy challenge is not really an exception to the general rule of deference to arbitrators. In evaluating these challenges, courts are "obliged to take the facts as found by the arbitrator." *Id.* And as we have just explained, courts also accept the arbitrator's interpretation of the contract. The question is simply whether the agreement, as interpreted by the arbitrator, may be enforced.

### C. Applying the public-policy exception to the general rule of deference

All of the context provided heretofore is, we think, critical to framing the issue put to us on appeal: whether the arbitral award issued in this case must be vacated on public-policy grounds. The question before us is not whether *Wilson's conduct* violated public policy. *Cf. Eastern Associated Coal*, 531 U.S. at 58 (explaining that the test was "not whether [the employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so."); *Otis Elevator*, 314 F.2d at 29 (explaining that question was not whether there was a public policy against gambling at work but rather whether there was one against reinstating someone who had been convicted of gambling at work). Nor is the question whether a hypothetical decision by MTA's management to reinstate Wilson would be void as against public policy. MTA could have decided to keep Wilson around, even if it had cause to fire him. Instead, the question before us is whether the agreement *as interpreted by the arbitrator* is unenforceable because doing so would violate public policy. *Cf. Eastern Associated Coal*, 531 U.S. at 62 (explaining that where a party seeks to vacate

an arbitrator's award on public-policy grounds, "we must treat the arbitrator's award as if it represented an agreement between [the employer] and the union as to the proper meaning of the contract's words 'just cause'").

In the present case, the arbitrator interpreted the contract between the MTA and Local 1300 to exclude from the contract's definition of "just cause" for termination a clearly established act of serious workplace violence because the MTA failed to consider mitigating circumstances in Wilson's work history as well as a range of lesser penalties available under the MTA's system of progressive discipline.

To support its position that public policy does not prohibit enforcement of the agreement as thus interpreted by the arbitrator, is not unenforceable on public-policy grounds, Local 1300 refers us to *MTA-Smith*, 305 Md. 380. In that case, MTA supervisors smelled alcohol on bus driver Andrew Smith's breath while he was on duty. *Id.* at 382–83. Smith refused consent to a breathalyzer test, but, based on the testimony of his supervisors and other witnesses, Smith was fired for "operating under the influence of alcohol." *Id.* at 383–84.

Smith appealed the termination in an arbitration proceeding, arguing that the MTA did not have "just cause" to terminate him. *Id.* at 384. The arbitrator agreed with Smith. While the arbitrator did not doubt that Smith had the smell of alcohol on his breath when he was on duty, he was "not persuaded that [Smith] was driving under the influence of alcohol." *Id.* at 385. Mere suspicion of driving under the influence, the arbitrator decided, was not

enough to provide the MTA with "just cause" to fire Smith. *Id.* The arbitrator ordered Smith's reinstatement without back pay. *Id.* at 386.

The arbitrator's award notwithstanding, the MTA refused to reinstate Smith, and so the union petitioned the circuit court to compel performance of the award. *Id.* at 387. The circuit court granted summary judgment in the MTA's favor, decreeing enforcement of the award "would violate the public policy of this State." *Id.*

The Court of Appeals vacated the judgment of the circuit court. The Court acknowledged that there may have been a clear public policy requiring the discharge for drunken driving of a public bus. *Id.* at 381–82. But the arbitrator found that Smith had not been shown to be driving under the influence. *Id.* at 390. All that the arbitrator found was that Smith was driving with the smell of alcohol on his breath, and no Maryland public policy compelled the discharge of a public bus driver for smelling like he recently had a drink. *Id.* at 393–94. In other words, there was no public-policy reason to not enforce a contract that excluded from its definition of "just cause" for termination smelling alcohol on a driver's breath. The arbitrator's construction of the contract—and his corresponding reinstatement of Smith—accordingly had to stand.

Local 1300 claims that the facts and circumstances in the *MTA-Smith* case are very similar to the case at bar, making that case controlling. We agree that *MTA-Smith* dictates the result here—but it is because of *MTA-Smith*'s differences from, not its similarities to, the case before us.

In the present case, we are not faced with a mere *suspicion* of wrongdoing. Security cameras captured the fight between Wilson and his stepfather. It is clear from the record—and was not contested before the arbitrator—that Wilson had a knife in his possession the evening he fought with Rosebrough, that during that fight he stabbed Rosebrough in the stomach, and that this occurred on MTA property. The arbitrator found that the stabbing "unmistakabl[y]" violated the clear language of MTA Regulations and the MTA's policy against workplace violence. The arbitrator also found no acceptable defense or justification for the stabbing. Unlike the bus operator in *MTA-Smith*, Wilson unambiguously violated the law. Moreover, his violation unambiguously consisted of a violent criminal act.

Because the arbitrator's factual findings leave the wrongdoing in this case clear (i.e., because we are not confronted with mere suspicion of wrongdoing), we have no difficulty in identifying an explicit and well-defined public policy that would be violated by the enforcement of the contract as interpreted by the arbitrator in this case.

To the circuit court, and in its brief, the MTA pointed to several sources of public policy that it asserted would be violated by enforcement of the arbitrator's award. At oral argument and in response to a question from the panel, counsel for the agency identified an additional source: Md. Code, § 11-105(1) of the State Personnel and Pensions Article ("State Pers. & Pens.").[4] For reasons that we will explain, § 11-105 sets out a public policy

---

[4] Section 11-105 states: (emphasis added)

> The following actions are causes for *automatic termination* of employment:
> (1) *intentional conduct, without justification*, that:

- 18 -

of this State that is flatly inconsistent with the arbitrator's award. Accordingly, we need

not consider any of the other public-policy arguments advanced by the MTA.[5]

        (i) *seriously injures another person*;
        (ii) causes substantial damage to property; or
        (iii) *seriously threatens the safety of the workplace*;
(2) theft of State property of a value greater than $300;
(3) illegal sale, use, or possession of drugs on the job;
(4) conviction of a controlled dangerous substance offense by an employee in a designated sensitive classification;
(5) conviction of a felony;
(6) accepting for personal use any fee, gift, or other valuable thing in connection with or during the course of State employment if given to the employee by any person with the hope or expectation of receiving a favor or better treatment than that accorded to other persons;
(7) (i) violation of the Fair Election Practices Act; or
        (ii) using, threatening, or attempting to use political influence or the influence of any State employee or officer in securing promotion, transfer, leave of absence, or increased pay;
(8) wantonly careless conduct or unwarrantable excessive force in the treatment or care of an individual who is a client, patient, prisoner, or any other individual who is in the care or custody of this State; and
(9) violation of § 3-314 of the Criminal Law Article.

[5] Specifically, in its brief, the MTA argued that the sources of public policy that would preclude enforcement of the award can be found in Md. Code, § 3-203 of the Criminal Law Article. This statute criminalizes second-degree assault and imposes a penalty of potential imprisonment and fines upon conviction. (The statute does not mandate any employment consequences for violators.) The MTA also argued that a relevant public policy could be found in its regulations and its own workplace-violence policy, as well as in the duty to ensure passenger safety imposed on common carriers.

That Wilson's conduct violated the criminal law, the MTA regulations and the agency's workplace-violence policy is not up for debate. And we do not minimize MTA's legitimate concerns regarding its common-carrier duties. However, in this case, we need not, and do not, address whether any of the sources of public policy identified by the MTA could be the basis for setting aside an arbitral award on public-policy grounds.

Section 11-105 provides that unjustified intentional conduct that "seriously injures another person" or "seriously threatens the safety of the workplace" is a cause for "automatic termination of employment" of state employees. The collective-bargaining agreement between the MTA and Local 1300 was interpreted by the arbitrator to mean that an act of serious workplace violence does not provide the MTA with "just cause" for termination. Judicial enforcement of the agreement as interpreted would violate the public policy explicitly set forth in the statute by the General Assembly. Through State Pers. & Pens. § 11-105, the legislature has stated, in no uncertain terms, that unjustified workplace violence—the kind of misconduct in which Wilson engaged when he stabbed Rosebrough on MTA property—provides a state employer with grounds for *automatic* termination. An arbitral award that this same conduct does not give the MTA just cause to fire Wilson unless it first considers Wilson's work history and other lesser alternative sanctions, directly contravenes the clear purpose of this statute. A Maryland court cannot enforce such an award any more than a Maryland court could hold that the MTA has the authority to enter into a contract that provides that § 11-105 does not apply to it. *Cf. Prince George's County Police Civilian Employees Ass'n*, 447 Md. at 201–05 (2016) (holding that because Prince George's County did not have the authority to enter into a collective bargaining agreement that permitted an employee to have a representative of the union present when the employee was interviewed as part of a criminal investigation, an arbitral award based upon such a provision was unenforceable.).

3. Local 1300's procedural argument

Local 1300's second argument is that the circuit court erred by failing to give proper consideration to the union's timely filed response when granting the MTA's motion for summary judgment. Local 1300 further asserts that this error was not harmless. We agree with Local 1300 in part.

It is clear that the circuit court mishandled this case: Local 1300's response to the MTA's motion was timely filed. The circuit court's conclusion to the contrary is plainly belied by the record. Because the circuit court should not have considered the MTA's motion in isolation, the proper course would have been for the court to vacate its initial order granting the motion for summary judgment and to start again from scratch. Although it appears from the transcript of the hearing that the circuit court intended to do this, its ultimate decision was nonetheless based in part upon its erroneous conclusion that the union's response was untimely filed.

If this were a case in which we afforded any degree of deference to the trial court's fact-finding or legal reasoning, we would vacate the judgment and remand the case for further proceedings. Such a step is unnecessary in this case because, as we explained above, we, just like the circuit court, are bound by the arbitrator's findings of fact, and we exercise *de novo* review over the circuit court's decisions to grant the MTA's motion for summary

judgment and to deny Local 1300's cross-motion. Thus, the circuit court's procedural misstep was clearly harmless.[6]

## Conclusion

We affirm the judgment of the circuit court. Insofar as the collective-bargaining agreement has been interpreted to exclude from its definition of "just cause" for termination clearly established serious acts of workplace violence, unless the MTA factors into its termination decision mitigating circumstances from the employee's work history and considers a range of less serious sanctions available, it cannot be enforced in our courts. Maryland public policy, explicitly set forth in State Pers. & Pens. § 11-105, provides that serious acts of workplace violence, like Wilson's stabbing of Rosebrough, give a state agency cause for automatic termination of employment.

We do not hold that the MTA was *required* by § 11-105 to fire Wilson. *See* State Pers. & Pens. § 2-101 ("Except as expressly provided by law, this title does not limit any express or implied management prerogative or other authority belonging to an appointing authority and management."). That an employer *has* "just cause" to fire an employee, or cause for "automatic termination of employment" under State Pers. & Pens. § 11-105, does not, by itself, compel termination. Nor do we hold that a similar interpretation would leave an agreement unenforceable in the context of private or local-government employment. State

---

[6] For the same reasons, we need not consider Local 1300's assertion that the circuit court "misstated facts" in its order granting MTA's motion. We are bound to accept only the facts found by the arbitrator.

- 22 -

Pers. & Pens. § 11-105 provides grounds for automatic termination of *state* personnel. *See* State Pers. & Pens. § 11-102 ("This subtitle applies to all employees in the State Personnel Management System within the Executive Branch except temporary employees.").

We simply hold that the collective-bargaining agreement at issue, as interpreted by the arbitrator through his award, is unenforceable on public-policy grounds. Accordingly, the arbitral award reinstating Wilson must be vacated.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. APPELLANT TO PAY COSTS.**